another that he had started a train, at the same time telling him to hold all traffic in the opposite direction over the same track.

[2] The railroad still further contends that the rulings of the court were correct, because plaintiff did not negative that the acts and conduct of the defendant complained of came within the exception of the act, which reads as follows:

"* * * In case of emergency, when the employés named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week."

We are again forced to disagree. The action, though for a penalty, is civil in its nature, and the pleader is not required to state his cause of action with the exactness and particularity that would be necessary in a criminal indictment. In the nature of things, in most cases arising under the act, facts bringing the case within the exception would be only within the knowledge of the railroad, and the government should not be required to allege that of which it knows nothing simply to conform to a mere technicality of pleading. If facts existed that would bring the case within the exception, they constituted a defense that the railroad should have pleaded and proved. See New York Central & Hudson River Railroad Co. v. United States, 165 Fed. 833, 91 C. C. A. 519; United States v. Kansas City Southern Railway Co. (C. C. A.) 202 Fed. 828.

We must hold that both assignments of error are well taken. The judgment is reversed, and the case remanded for a new trial.

═══════════

SANBERN v. PANAMA R. CO. et al.

(Circuit Court of Appeals, Second Circuit. May 12, 1913.)

No. 197.

1. SHIPPING (§ 132*)—INJURY TO CARGO—LIABILITY—EVIDENCE.

On a libel in personam for injuries to a cargo of wool, evidence *held* to require a finding that the consignment was delivered to a lighter and to the terminal steamship dry, and was injured by being stored on the lighter or steamer with wet wool, and was not wetted by being negligently stored outside the wharf while waiting transportation by the terminal carrier.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*

Liabilities of vessel owners for loss or injury from improper stowage, see note to The Gualala, 102 C. C. A. 553.]

2. SHIPPING (§ 143*)—INJURY TO CARGO—LIABILITY OF CARRIERS.

Where a shipment of wool was wetted and injured by contact with other wet wool on the lighter or the terminal steamship, and it was impossible to determine how much of the damage each contributed, they would both be required to share the loss.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 489; Dec. Dig. § 143.*]

Appeal from the District Court of the United States for the Southern District of New York.

─────────────
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Libel in personam by Albert W. Sanbern against the Panama Railroad Company and others. Decree for libelant against the Metropolitan Steamship Company of New Jersey and against George L. Hammond & Co., and the Steamship Company and Hammond & Co. appeal. Affirmed.

The opinion of Hand, District Judge, in the trial court, was as follows:

This is a suit upon a libel in personam brought by the assignee of the shipper of a cargo of 91 bales of wool from San Francisco to Boston. The wool was originally consigned to the Southern Pacific Mail Steamship Company for delivery to the Panama Railroad, which was to carry it across the Isthmus, and from there by ship to New York. At New York it was delivered by the Panama Railroad Company to the Metropolitan Steamship Company, who carried it to Boston. The transfer from the pier in the North River of the Panama Railroad to the pier in the same river of the Metropolitan Steamship Company was by a lighter of George L. Hammond & Co., the agent of the Metropolitan Steamship Company to do the service. Concededly some of the wool delivered by the lighter to the railroad was wet, and the damage in question occurred either because the wet wool included the libelant's consignment, or that consignment, though delivered dry, was stored with wet wool on the lighter, or on the steamer, or both. In the first case the railroad is liable; in the second, the lighter, or the steamer, or both.

Two hundred bags of wool reached the city of New York on the 15th of April, 1909, ex steamship Advance, and were unloaded by the railroad at its wharf in New York. One hundred and nine of those bales were in any case stored in the open air upon the asphalt of West street close by the bulkhead. They were covered with tarpaulins and supported by dunnage about the thickness of which there is some dispute. The railroad contends that the remaining 91 bales were stored in its covered dock, and they attempt to prove it by incontestable testimony, which will be considered hereafter. On the 20th of April the steamer Allianca arrived with 90 more bales of wool consigned to a different person. This was discharged by the railroad, on just what day does not appear, and was either placed in the sheds or alongside of the other bales on West street at the bulkhead. The chief controversy in the case arises from whether the 91 bags which belonged to the libelant's assignors were originally placed with the 109 bags on the West street bulkhead, or were placed within the shed. If they were placed within the shed, concededly they received no damage while in the custody of the railroad; if they were stored along with the other 109 on the bulkhead, the great probability is that they received their conceded wetting while there.

On April 19th it rained from 6 until nearly 10 o'clock in the evening; the total precipitation being about one-fifth of an inch. The next day it rained from 4 in the morning until 11 in the evening, the precipitation being sixty-five hundredths of an inch. On the 21st it rained from half past 3 in the afternoon until 5:30, and again from 7:30 in the evening until 1 o'clock in the morning, and the total precipitation was eighteen hundredths of an inch. On the 22d it rained for a half hour in the morning, and the total precipitation was eighteen hundredths. On the 23d it rained from 8 until 9 in the morning and from a little after 9 until 2 in the afternoon, with a total precipitation of thirty-one hundredths. Thereafter the weather remained fair up to and including the 26th.

The lighter received the order to get the wool on the 22d and went up alongside of the pier; but owing to the rain she did not begin to take the wool until the 24th, when she loaded the full 200 bags constituting her first order. These were tallied off separately by the employés of the railroad and were delivered by separate marks; that is to say, the marks were not indiscriminately mixed up. The goods consisted of four consignments, that to the libelant's assignors, another of 20, another of 30, and a fourth of 59 bales; the last three, however, being consigned to but one person. On the 24th, and after loading these 200 bales, the lighter received another order to

take on the 90 bales ex Allianca, and this she did, piling them alongside the 200 bales already on board. She remained at the pier over Sunday and delivered the bales to the Dimock on Monday, the 26th. It is conceded by all parties that some of the bales when delivered to the lighter were wet. The captain signed a receipt with exception for the 109 bales and without exception for the 91 and 90 bales. His explanation of that fact is that he signed the receipts without exception, and that the delivery clerk of the railroad promised to write the exception in afterwards in the case of the 91 bales, but did not do so. The delivery clerk admits that he made out the receipts, but says that he made them in accordance with the tally of the slips handed to him by his checkers, which were put in evidence. The 90 bales the captain says were quite dry, and he insists they were those that came from the shed, and that the 91 bales now in question had been piled along with the 109 on the bulkhead. It is certain that many of the bales, when delivered alongside the ship were very wet, so much so that hooks could not safely be used on the tackles so that they were carried up in slings. The whole 200 bales were kept together in the ship's hold and were delivered in Boston the next morning. The 90 bales were mixed in among some 500 others in another hold and were not adjacent to the bales in question.

The railroad proves by its dock checkers, who checked the 91 bales, that they were all placed in the shed, because, when the Advance arrived there was room there for these, although the other 109 were stored on the bulkhead. He is corroborated in this by the superintendent of the line, Bawden, and the head watchman, Killian, each of whom professes to remember the 91 bales and that they were put into the shed. Furthermore, Golden says that he never did any work on the bulkhead, but always checked on the dock, and Eberwein, the bulkhead checker, corroborates Golden in this respect. The tally slips show that 91 bales with the mark of the libelant's assignor were weighed by the dock checker, and that the other bales were weighed by the bulkhead checker; the name of each being written adjacent to the tally made by him. The railroad asserts that the memory of all these witnesses is better than would be otherwise the case, because a dispute soon arose over the condition of the wool on delivery, and within a month or two after the events in question the attention of all had been called to it, and each prepared affidavits stating his recollection at that time. This also applies to the master of the lighter, Gulbrandson, who testified that the 91 bales in question had been stored on the bulkhead, and were taken from there, and that the 90 bales came from the shed.

[1] The case, although it involves only a very narrow question of fact, is extremely puzzling. At first blush I should be strongly inclined to hold that the 91 bales had been put with the 109 out upon the bulkhead, and that the 90 bales had been put in the shed. There are strong reasons for so thinking, so strong as to throw some doubt upon even the clearest testimony to the contrary. It is quite true that there was no inherent unlikelihood that the 91 bales should have been put in the shed, instead of the 90. Nothing made it necessary to put together the consignments ex Advance, and if there was a place open on the 15th or the 16th it was as likely that the 91 bales should fill it, as that the 90 should fill it later. The condition of the bales, however, is rather extraordinary. All the 90 bales were dry, and at least 15—indeed, the libelant claims 67 of the 91 bales were, or had been, wetted. Now it is possible to see how both of these things could have happened, but it is hardly more than possible. One may imagine that the 90 bales, coming as they did on the 20th, the day of the heaviest rainfall, were not discharged until the morning of the 21st, which was fair; indeed, that is more probable. If they were then piled separate from the 109 bales already there, they might have stayed dry during the subsequent three days of rain, which was much lighter than that of the 20th. Indeed, such a rain might not have formed any puddles between the dunnage into which the soft ends of the bales apparently sagged. Yet such an explanation seems rather far-fetched and one can hardly expect that the same precautions would at once have wholly protected the 90 bales, and so thoroughly soaked the 109 bales, even

allowing for the difference in the time of exposure. As I said above, it is possible, but hardly more than possible.

Again, it is a little strange that the 91 bales should have been so much damaged by mere contact with the 109. When the ship was discharged in Boston, there were 15 of the 91 wet and only 9 of the 109. It is true that 48 others were stained, and so perhaps had been wet, yet this is rather an unexpected result, if the 91 bales were dry. Moreover, the contact of the 90 bales on the lighter for two days appears not to have wet them substantially. Here again, however, the 91 bales were piled among the 109, though the marks were kept together. Finally, it would have been very negligent to store the wet and dry together, and Shea says they never did it.

The upshot of it all is that there is very strong antecedent probability for supposing that the 91 bales got wet on the bulkhead. However to reach that result I should have to disregard the unimpeached testimony of four witnesses, not disinterested, it is true, but still corroborated, as I shall show. Disregarding the testimony of Bawden and Killian as memory only, I should have to suppose that Golden either deliberately added his name to the tally slip, or that both he and Eberwein were suppressing the truth when they said that he never checked on the bulkhead. They would hardly have forgotten an exception to a uniform practice, if it had in fact occurred. Bawden somewhat corroborates them in saying that Golden was the dock checker, and I think that the appearance of his name as the checker of the leather adds further corroboration. Again the tally slip of the 90 bales was signed only by Eberwein, which presupposes again a deliberate suppression of the truth, unless the 90 bales went upon the bulkhead. Finally, the testimony of Gulbrandson's receipt and of Harrow's corroboration of its truth as against the latter is persuasive to my mind. I may say, in passing, that Gulbrandson did not impress me strongly in his favor, and that, if forced to choose, I should prefer Harrow.

While, therefore, no certain conclusion is possible, I cannot hesitate, when choice is necessary, to accept the version of the railroad, at least to the extent of holding that the subsequent carriers have not succeeded in carrying the burden of their proof. I regard the case as though the libelant had sued the last carrier, and he the next, and so on. Thus each carrier has a burden as against any subsequent carrier he may hope to charge. While I am cited to no authority, this seems to me the necessary result of the situation.

[2] The question remains between the lighter and the steamer. The necessary conclusion is that the 91 bales were wetted by contact with the 109. Precisely the same treatment was given them by each carrier, and it is quite idle to speculate how much of the damage each contributed. They must share the loss between them.

Therefore let the libelant take a decree against the steamer and the lighter for half each, with decree over against the steamer for the lighter's half, if the lighter does not respond to an execution.

Foley & Martin, F. A. Spencer, Jr., and William J. Martin, all of New York City, for appellant Steamship Co.

Harrington, Bigham & Englar and D. R. Englar, all of New York City, for appellant Hammond.

R. R. Rogers, of New York City, for appellee Railroad Co.

Kneeland, Harison & Hewitt and William Harison, all of New York City, for appellee Sanbern.

Before LACOMBE, COXE, and WARD, Circuit Judges.

PER CURIAM. Decree affirmed, with interest and costs, on opinion of Judge Hand.